UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL R., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|   vs. | )   Case No. 4:21 CV 679 JMB |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
|     Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On February 1, 2019, Plaintiff Michael R. filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq* (Tr. 185-191). In his application, he alleged that he became disabled on December 21, 2018 because of his health conditions, most notably chronic obstructive pulmonary disease (COPD) (Tr. 185, 214). After Plaintiff's application was denied on initial consideration (Tr. 83),[1] he requested a hearing from an Administrative Law Judge (ALJ) (Tr. 87).

Plaintiff and counsel appeared for a hearing on September 24, 2020 (Tr. 28-53). Plaintiff testified concerning his disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Carma Mitchell. The ALJ issued a decision

---

[1] Plaintiff began receiving retirement benefits in February, 2019 (Tr. 79).

partially denying plaintiff's applications on October 13, 2020. (Tr. 11-21). The ALJ found that Plaintiff's actual onset date was February 7, 2020, and not December 21, 2018 as alleged, because of COPD and a shoulder condition. The Appeals Council denied plaintiff's request for review on April 13, 2021. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Reports and Hearing Testimony

Plaintiff was born in June, 1954 and was 64 years old on the alleged onset date (Tr. 218). He lives with his wife in a house (Tr. 213, 220). He has a 9th grade education and has training as a truck driver (Tr. 215). He has had a variety of jobs including bricklayer, heavy equipment operator, and truck driver (Tr. 215).

Plaintiff lists his disabling impairments as bladder cancer (stage 1), COPD, neck problems upper back problems, depression, anxiety and high cholesterol (Tr. 214). In February, 2019, his medications included Atorvastatin (cholesterol), Lisinopril (blood pressure), Sertraline (depression), and Tamsulosin (for his bladder) (Tr. 216).

Plaintiff's April 2019 Function Report states that he must take frequent naps and rest periods, that he cannot walk far, that he must take frequent breaks to use the restroom, that he is deaf in one ear and otherwise hard of hearing, and that he has difficulty understanding job duties (Tr. 220). He states that on a typical day, he wakes up at 6:00 a.m. to use the bathroom and take medication, then goes back to sleep; wakes up again at 8:30 a.m. to eat breakfast and then goes to sleep again; wakes up again at 2:00 p.m. and goes out for a walk, eats dinner, watches T.V. and then goes back to sleep (Tr. 221). His sleep is interrupted because he needs to use the restroom (Tr. 221). He does not have difficulty with self-care, although he needs reminding to shave and

take his medication (Tr. 221-222). He makes simple meals, uses a riding lawn mower, does some housework, drives a car, watches TV, reads and talks on the phone (Tr. 222-223). But he cannot/does not handle his bank accounts or pay bills, can no longer hunt or do "outside" projects because of trouble breathing and having to urinate frequently, and does not go out very often (Tr. 223-224). He can only lift a maximum of 10 pounds, stand for 30 minutes, walk 10 steps without feeling short of breath, walk up 5 stairs; he has difficulty squatting, kneeling, handling routine changes, remembering, paying attention, completing tasks, and hearing (Tr. 225-227). According to his daughter, he has trouble catching his breath, he sleeps a lot, and he cannot lift, carry, or work like he used to (Tr. 236).

Plaintiff testified at the September 2020 hearing that he did not complete high school or get a GED but that he has specialized training as a truck driver, although his commercial driving license expired (Tr. 35-36). He stopped working as a truck driver in December, 2018 because he had difficulty breathing with exertion and difficulty hearing (Tr. 38). As to his functional limitations, he testified that he has trouble walking for more than a minute without getting winded (Tr. 40). He uses inhalers, which help a little to relieve his breathing condition (Tr. 43). He also has right shoulder pain. (Tr. 42). Plaintiff is a smoker and smokes half a pack of cigarettes a day (Tr. 44). Plaintiff's testimony is undeveloped as to when his shoulder pain began and what functional limitations it imposes on his day-to-day life.

Vocational expert Carma Mitchell testified that Plaintiff's past work as a truck driver is considered semiskilled and medium/medium-heavy exertional work, and his past work as a heavy equipment operator is considered skilled and medium exertional work (Tr. 45, 48). Ms. Mitchell was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was able to perform medium work, but no climbing on

ropes, ladders, or scaffolds and who should avoid concentrated exposure to temperature extremes and pulmonary irritants such as gas, fumes, odors, dust, and a workspace with poor ventilation (Tr. 48-49).  She testified that such a person could not perform Plaintiff's past relevant work but that there would be other work available such as dining room attendant (Tr. 49).  If the hypothetical individual was changed to performing light exertional work, Plaintiff still would not be able to do his past relevant work (Tr. 50).

### B.     Medical and Opinion Evidence

Plaintiff's argument focuses on the ALJ's finding that he could perform medium exertional work prior to February 7, 2020.  Accordingly, the Court will focus on that time period.

On December 8, 2017, Plaintiff sought treatment from his established doctor, Dr. Megan E. Warhol, who noted that he had been diagnosed with COPD and that he was using Symbicort, Albuterol, and Flonase which helps with his symptoms (Tr. 293).  In examining his respiration, she noted: "faint expiratory wheezes at base resolved with deep inspiration, rales, rhonchi, normal respiratory effort" (Tr. 296).  His medication, Albuterol and Symbicort, were continued "as needed for shortness of breath or wheezing" (Tr. 296).  He was strongly encouraged to quit smoking, which he declined (Tr. 297).  At subsequent appointments through November 2, 2018 there is no notation that his breathing difficulty was worsening; rather, no wheezes or faint wheezing were observed with otherwise normal respiration (Tr. 304, 310, 312, 318, 323, 325, 328, 332,333, 340).  There is no indication that his medication was increased or changed in response to a worsening condition or that he complained of breathing difficulties upon exertion or otherwise during his

appointments with Dr. Warhol – the November 2, 2018 appointment did not mention any issues or concerns related to breathing or shortness of breath.

In December 2017, he started complaining of blood in urine (Tr. 301). In February 2018, he was seen by Dr. Christopher D. Jaeger for evaluation of a gross hematuria (blood in urine) and a bladder tumor (Tr. 277-291). During that visit, he had normal physical and psychiatric examinations and it is noted that he had "non-labored respirations; Comfortable respiratory effort without recruitment of accessory respiratory muscles" and that he "moves all extremities symmetrically" (Tr. 279). After evaluation, he was started on Flomax to address his benign prostatic hyperplasia (frequent urination) and nocturia (nighttime urination) and a bladder resection surgery was suggested (Tr. 277-291). He had the surgery and at an appointment with Dr. Warhol on March 16, 2018, he indicated that he was doing well and had returned to work (Tr. 320). At that visit, he also indicated that he was "always incredibly tired" and sought treatment for fatigue (Tr. 320). Dr. Warhol planned a sleep study and again encouraged him to stop smoking (Tr. 323). There are no records that the sleep study was conducted and no further complaints of tiredness to Dr. Warhol.

The first medical record after the alleged December, 2018 onset date, is a May 18, 2019, encounter with consultive examiner Dr. John Krause (Tr. 366-369). Plaintiff reported that he had shortness of breath, fatigue, and weakness that prevents work (Tr. 366). However, after a physical examination, Dr. Krause indicated that "the claimant did not display any dyspnea [(labored breathing)] on exertion or orthopnea [(breathlessness)] at any point during the physical exam (which appeared to include range of motion movements and strength testing) and did not report any fatigue, palpitations or shortness of breath on physical exam" (Tr. 369). Dr. Krause found that Plaintiff had full range of motion, normal grip strength, normal strength, and no muscle weakness

(Tr. 370-372). On July 12, 2019, Plaintiff appeared for an annual wellness visit with Dr. Brandi E. Street, who works in the same practice as Dr. Warhol. He reported that he continued to use Albuterol and Symbicort and had no worsening shortness of breath (Tr. 400). While he had a cough, he also had normal respiratory effort (Tr. 402). He also reported increased problems with his bladder including increased urgency in urinating (Tr. 400). He was directed to follow up with his urologist and continue taking Flomax (Tr. 402). There is no indication in the record that he followed up with his urologist.

On December 5, 2019, he began complaining of shoulder and upper back pain that may have been injured in a fall "years ago" (Tr. 419). He reported that he went to see a chiropractor but did not get relief (Tr. 419). An examination revealed pain upon shoulder movement and an x-ray was ordered (Tr. 420).[2] On February 7, 2020, it is noted that he had calcific tendinitis of the rotator cuff for which he was given a steroid injection (Tr. 427). He also reported shortness of breath and wanted stronger medication – an examination revealed decreased breath sounds and he was prescribed Spiriva (Tr. 425, 427).

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, Plaintiff must prove that he is disabled under the Act. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment

---

[2] The record does not contain either the chiropractic notes or a copy of the x-ray.

or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." Id. Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance.

Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. **The ALJ's Decision**

The ALJ's decision in this matter conforms to the five-step process outlined above. (Tr. 11-21). The ALJ found that plaintiff met the insured status requirements through March 31, 2020 and had not engaged in substantial gainful activity since December 21, 2018, the alleged onset date. (Tr. 13). At step two, the ALJ found that plaintiff had the severe impairments of COPD since the alleged date and COPD and right rotator cuff syndrome since February 7, 2020 (Tr. 13). The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. The ALJ specifically addressed listings 1.02 (major joint dysfunction) and 3.02 (chronic respiratory disorder). Plaintiff does not challenge the ALJ's assessment of his severe impairments or his determination that Plaintiff's impairments do not meet or equal a listing.

The ALJ next determined that prior to February 7, 2020, Plaintiff had the RFC to perform medium work except: he could have no climbing on ropes, ladders, or scaffolds; he needed to avoid concentrated exposure to temperature extremes and pulmonary irritants such as gas, fumes, odors, dust and workspace with poor ventilation; and he needed to avoid concentrated exposure to work hazards such as unprotected heights and being around dangerous moving machinery (Tr. 16). The ALJ further found that after February 7, 2020, Plaintiff could only perform light work   In assessing plaintiff's RFC, the ALJ summarized the medical record; written reports from plaintiff; plaintiff's work history; and plaintiff's testimony regarding his abilities and condition. (Tr. 16-

Page **9** of **14**

21). Plaintiff asserts that the ALJ improperly assessed the date his impairments began and that RFC for medium work is not supported by substantial evidence.

At step four, the ALJ concluded that plaintiff was unable to return to any past relevant work. (Tr. 19). His age on the alleged onset date placed him in the "closely approaching retirement age" category. He has a limited education (Tr. 19). The transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that Plaintiff was not disabled whether or not she had transferable job skills. The ALJ found at step five that, again prior to February 7, 2020, someone with Plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in substantial numbers in the national economy, namely as dining room attendant. (Tr. 20). However, after February 7, 2020, the ALJ found that Plaintiff could only perform light work and that, consistent with the Medical-Vocational Rule 202.02, is presumptively considered disabled (Tr. 21).

## V. Discussion

In making his arguments, Plaintiff focuses on COPD, his shoulder condition, and pain and argues that the ALJ failed to properly evaluate his functional limitations, the medical evidence, and appropriately evaluate his pain.

In evaluating Plaintiff's medical conditions, the ALJ found that Plaintiff suffered from the severe impairment of COPD prior to February 7, 2020 and that he suffered from both COPD and a severe shoulder problem after that date. However, the ALJ found that Plaintiff's COPD did not produce the functional limitations that Plaintiff testified to at the hearing from December 2018, and that it was only after February 7, 2020 that his conditions resulted in a RFC for light work. Plaintiff points out that medical records prior to that date show that Plaintiff had wheezing and shortness of breath. Plaintiff is correct that the medical records, mostly from Dr. Warhol, did

occasionally note wheezing; but, Plaintiff was prescribed efficacious medications for these conditions.  The records do not demonstrate that his conditions became worse over time, and, he was working in a medium to medium/heavy occupation during that time period.  And, even after Plaintiff's alleged onset date in December, 2018, there is no medical evidence that would support a claim that his condition markedly deteriorated in 2019 – there is no evidence that he sought additional or specialized treatment for his COPD, the May 2019 strength and range of motion examination did not reveal any breathing difficulties,[3] and he did not seek any additional medication or indeed did not complain of worsening shortness of breath at a routine annual examination two months later.  Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2010) (holding that the ALJ properly found that the plaintiff's subjective complaints were not supported by the objective medical record).

Rather, as the ALJ pointed out, it was not until February 7, 2020 that he sought stronger breathing medication and there were related clinical findings of "decreased chest sounds throughout."  (Tr. 425, 427).  Subsequent chest CTs on February 18, 2020 and August 19, 2020 revealed some inflammation in his lungs ("granuloma"), nodules, and "diffuse emphysematous changes" (in the second, August 2020 CT) (Tr. 436, 441).  Based on this medical evidence of a worsening condition, the ALJ reasonably found that the onset date of a disabling COPD condition was not December 2018 as alleged by Plaintiff but rather February 7, 2020.  Thus, the Court finds that there is substantial evidence in the records supporting the ALJ's conclusions as to Plaintiff's COPD.

---

[3] Plaintiff speculates that during the May 2019 examination, Plaintiff was not required to exert himself and that the testing necessarily would not have revealed any shortness of breath.  Speculation does not demonstrate disability.

However, this same conclusion cannot be reached with respect to Plaintiff's shoulder condition. The ALJ found that this condition, which along with worsening COPD, resulted in an RFC for light work (with other limitations) with an onset date of February 7, 2020. In particular, the ALJ stated:

> The claimant's right rotator cuff syndrome further supports reduction to light work. Just prior to the established onset date, the claimant reported having right shoulder pain. (Exhibit 6F/31). The examination revealed reduced range of motion with pain, crepitus, and a positive Neer's sign. *Id.* at 32. In February 2020, the claimant reported additional symptoms, including experiencing numbness in his arm along with the existing shoulder pain. *Id.* at 37. The objective evidence generally supports the claimant's allegations of pain. The right shoulder x-ray showed tendinitis of the rotator cuff and he exhibited tenderness and reduced range of motion on examination. *Id.* at 38-39. The claimant also began undergoing treatment for his pain, which included a steroid injection. *Id.* at 39. Thus, the claimant's right shoulder pain further supports reduction to light work (Tr. 19).

This recitation is not accurate. Plaintiff initially complained of shoulder and neck pain on December 5, 2019 and stated that he was having "more pain" with no shooting pain that was not resolved by a chiropractor (Tr. 419). At that examination, it was found that "pain is right posterior occiput; did have increased pain with axial loading. Seems to hold his head slightly flexed forward" and "could not externally rotate his shoulders due to pain; positive crepitus with ROM and positive neers, negative thumbs down" (Tr. 420). While the doctor did not appear to order pain medication, he did order diagnostic testing, an x-ray of his neck and shoulder and appears to had told Plaintiff that he could get a steroid injection. The record does not contain a copy of the x-ray results so it is unclear when it was taken. At the next appointment on February 7, he did not report worsening symptoms; the record reveals "[n]o numbness in arms" (contrary to the ALJ's opinion) but with tenderness in his AC join and similar limited range of motion (Tr. 425, 427). Thus, in December, the doctor found a diagnosable problem with his shoulder that was confirmed by x-ray (presumably taken in December) and in February, Plaintiff took the next step, suggested

by the doctor, in getting a steroid injection.  There is no development in the record about when the x-ray was taken, why Plaintiff waited two months to get the steroid injection, or what functional limitations or pain he experienced as a result of his shoulder condition prior to February, 2020.

Based on the foregoing, the date that the ALJ picked was when Plaintiff's condition was *diagnosed*, not the date the condition began or perhaps the date that the condition became disabling due to pain.  Social Security Regulation 83.20 provides that the "onset date of disability is the first day an individual is disabled as defined in the Act and the regulations" and that factors to consider include "the individual's allegations, the work history, and the medical evidence."   The medical reports are the "primary element in the onset determination" and the ALJ can infer an onset date from the medical records if that date is not obvious (i.e. for example from a traumatic injury).  In this case, a reasonable inference from the medical records is that the onset date is prior to the date of diagnosis.  At the very least, the ALJ was required to develop the insufficient record, by perhaps seeking a copy of the shoulder x-ray or asking Plaintiff questions at the hearing, in order to assess the onset date of Plaintiff's shoulder condition and his pain prior to diagnosis.  Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002) (indicating that remand is appropriate where the record is not fully developed).

In the social security context, medical evidence that pre-dates or post-dates an established date of disability can be relevant to that disability.  For example, "medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before he expiration of his or her insured status."  Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).  An ALJ is further required to consider all the evidence in the record, even that which pre-dates the onset of disability.  See Vandenboom v. Barnhart, 421 F.3d 745 (8th Cir. 2005).  Here, the ALJ misstates the medical

record, did not develop the record as to when Plaintiff's shoulder condition became disabling, and does not explain why February 7, 2020 is the onset date as oppose to an earlier date.  The ALJ's use of February 7, 2020 as the onset date for Plaintiff's shoulder condition (which the ALJ found resulted in an RFC for light work) is not supported by the record.  Thus, this case must be remanded for a complete evaluation of Plaintiff's shoulder condition and pain and a reevaluation of the onset date of disability.

\* \* \* \* \*

For the foregoing reasons, the Court finds that the ALJ's determination as to Plaintiff's shoulder condition is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED in part and REMANDED** for further proceedings consistent with this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of August, 2022